## SUPREME COURT.

### George W. Cothran agt. Sarah A. Collins.

The *maker of a promissory note* which has been *stolen* from the real owner and holder *long after it became due*, is protected, in the absence of fraud, in its payment to an entire stranger, although the circumstances attending the payment are such as to constitute *gross negligence* in not making inquiry as to the true ownership and title to the note (Daniels, J. *dissenting*).

*Heard at Erie General Term, February,* 1864. *Decided Erie General Term, September,* 1864.

*Heard by* Davis, *P. J.,* Grover, Daniels *and* Marvin, *Justices.*

This action was brought to recover the amount of the following promissory note :

"$2,400. Rochester, *July* 15, 1862.

"Twenty days· from date, for value received, I promise to pay Geo. W. Cothran or bearer, twenty-four hundred dollars, with interest semi-annually, at Niagara County Bank, Lockport, N. Y., being balance due on settlement.

(Signed) "S. A. Collins."

The answer alleged payment to a holder of the note. The issue was tried at Niagara circuit, in May, 1863, before Justice Davis and a jury. The evidence on the part of the plaintiff showed that the note was retained by plaintiff in his possession until August, 1862, when the plaintiff, who

---

*Note.—This is a very important and interesting question, and this decision is probably the only reported case of the kind.—Rep.

was a captain of a battery of artillery in the volunteer service of the United States, being about to return to his command in Virginia, delivered it to his mother, who resided at Lockport, New York, to be kept for him, and to be hers if he never returned. He rejoined his command immediately, and next saw the note in his mother's possession January 12, 1863, at her house; that he again returned to the army at Fairfax Station, Va., and next saw the note March 13, 1863, in defendant's possession at Rochester, N. Y., with defendant's name partly cut and partly torn off, and having plaintiff's name indorsed on its back, which indorsement is a forgery.

*Amelia Cothran* was called as a witness and testified : " I am the mother of the plaintiff; recollect when he went away in August last; he gave me some papers, a note of defendant and one against Taylor, to keep; I put them in a drawer in the bureau where I keep my deeds and other papers; I always kept this drawer locked and the key in a large drawer under this, under the clothes; I saw note when plaintiff came home in January; I took the package out of the drawer; he took draft out and handed me back papers except draft, and I put them in the drawer and locked it; I went to Rochester in March, with the plaintiff; defendant produced the note in same condition as now; I gave plaintiff the draft; he handed it back to me, and I went to bank and got $100 and handed him; there was some gold in the drawer; I have known defendant five years; she was at my house in January, after plaintiff left; came there on Saturday and staid until Monday; slept in the bed in the room where bureau was in which note was kept; was there again in February; staid over night; lodged in same room; the defendant was at my house in December or January; the gold was there in the drawer when she was there in January, and also when plaintiff came home in March; I have never given this note to defendant or any other person, or authorized or

directed its payment; the gold and silver ($43) was in the drawer in January and February."

And on being recalled, same witness testified: "I had conversation with defendant about this note; before plaintiff let me have this note she asked me what he had done with it; I told her I did not know; he was then in Buffalo; afterwards I was at defendant's house and she again asked me what had been done with the note; I told her I had it; that plaintiff had made a will and given me all he had, and if he did not come back I should have the note; she then said it is all right; I told her daughter Martha, in January, I had received a letter from the plaintiff, asking me to get money of her mother; she said, it is no use, mother cannot raise it; after this I told defendant what Martha had said, and that I had the letter from plaintiff; she said she could not pay; that she was glad I had the note, if he never got back it would be all right."

On being cross-examined the said witness further testified: " After the defendant asked me about the note in August, I had my little grand-daughter write to her that I had it; I recollect conversation at her house in December, and at mine in January; in January she asked me if I kept the note yet; I said I did; she said I am glad of it, if he never comes back you and I can make it all right; I recollect her being at my house in July or August, and asking me about the note; I do not recollect of saying to her that plaintiff had not said anything to me about the note; I told her I would inquire and write her."

*John Cothran* being duly sworn, testified; " The plaintiff is my uncle; I went to Mrs. Cothran's in November last, the 24th, and staid until March; did not see the note while there; defendant was there in December, staid two nights; there in January, staid two days and nights, and again in February, staid one night; occupied room where bureau was."

*Catharine Grove* being duly sworn, testified: "I lived with

Mrs. Cothran last winter; commenced the 13th December, and staid four months; plaintiff is my cousin; staid there as company for his mother, my aunt; I know the room in which bureau is kept, and the bureau; I knew defendant; she was there in January and February last; in January she came Saturday and staid until Monday; came alone and staid and slept alone in room where bureau was; there was fire in the room part of the time while she was there in January and February; she came February third, and staid over night; slept alone in this room where bureau was; I saw the note after plaintiff brought it from Rochester in March for first time; looked same as now; never saw it before or heard of it; never opened drawer, nor did I know of its contents."

The plaintiff introduces in evidence a letter written by defendant to him, dated Rochester, August 11th, 1862, and received by plaintiff August 14th, at Lockport. The part relating to the note is as follows:

" I received a line by Miner from your mother, *by which I learn there was a misunderstanding in reference to a remark I made about the note I gave you.* I think it will not be necessary to go into the details of an explanation here, as I can explain to you in three minutes when I see you. But she evidently took my remark as intending to convey a very different idea from what I intended it should. *I had not the slightest idea that you intended to dispose of it in any way. So let it drop until I see you.* I will then explain.

" As ever your friend,

" S. A. COLLINS."

The *plaintiff* was also sworn, and testified to leaving the note with his mother, and to having seen it January 12, 1863, and returned it to his mother, who replaced it in and locked the drawer, which was the last he saw of it until he found it in defendant's possession with her name taken off, and with his name written on the back of it in a forged hand, and that he never disposed of it in any manner, and

had nothing further to do with it after returning it to his mother January 12.

It also appeared that from the 12th January, 1863, to March, when plaintiff again returned from the army, that other persons had occupied this room where the note was kept, each of whom was called and testified that they never knew there was such a note, and did not take it. It also appeared that Mrs. Cothran once in the fall of 1862 lost her front door key, and procured one from her son David for a few days until she got another.

The *defendant* was sworn in her own behalf, and testified: " When this note was given, plaintiff came to my house at Rochester; I next saw plaintiff in March last at my house, when he got the note; think I was at his house within three days after giving of note; he was not at home; I cannot tell when I was there next; think in the fall; I was there in January; came from Buffalo; was there again in February, on my return from funeral at Black Rock; came down on the evening train; staid at house over night; in the morning went to Stevenson's, and left that evening; Mrs. Cothran told me she had the $2,400 note; this was not long after plaintiff left for the army; not more than a month; it was also spoken of when I was there a day or two after the note was given; I never saw or knew where Mrs. Cothran kept her deeds; in February I went from here to Rochester; I first saw the note after I gave it in the hands of a gentleman at my house in Rochester; he came there, asked my name, said he had a note in favor of plaintiff, and supposed I was the person who gave it; he presented the note; I had never seen him before; I told him it was my note; asked him if he had bought it; he said he had, and under such circumstances that if promptly paid he could throw off the interest; I asked him where I could see him when I found out what I could do; he said he resided in Buffalo, and could be down in two weeks, and would call again; he then left; I took

counsel of Geo. P. Townsend as to my right to pay the note. This person called again on the 16th day of February; counsel said I would be obliged to pay the note to any one presenting it; I paid him $1,900 in money, and note for $500; drew note myself, and sent it by my daughter to Marsh to sign; I had known Marsh twenty years; note brought back signed by him; I got the money and gave it to my daughter to count; she counted it; I had done so previously; he counted it, took it and the $500 note, and gave me the $2,400 note; he left; I went to the door with him, and when I returned I took my name off the note at the table; set there some time; I told him I should be unable to pay more than $1,900, and asked him to take note for $500 at three years; I asked him if he considered it prompt enough to throw off the interest; he said he did; I got the money; part of Luman H. Nichols, $1,100 of Mrs. James Stevenson, $300 of E. B. Booth, and balance of Nichols; I got money of Stevenson and Booth to pay upon $10,000 mortgage, on which payment was past due, $2,000 and interest; foreclosure was commenced in October; it was claimed that the whole had become due; I found out facts in December; got the $300 of Booth between the times this person was there, to pay upon the note; I did not take this note from the house of Mrs. Cothran, or conspire to have it done, nor know anything about it; the payment by me was in good faith; in March when plaintiff was at my house he asked me if I had the note; I said I had; he asked me if I would let him see it; I said yes, and got it from my work stand; he said he wanted to take it to investigate the matter; said he would return it; I gave it to him; I had received this letter of March 8, 1863, previous to his coming to my house; I answered that letter next day; I wrote in that letter in substance that the thing was mysterious.

On being *cross-examined,* said witness further testified : When plaintiff came to my house in March he made

inquiries about note; I stated to him that I had paid the note to a man I did not know, who said he lived in Buffalo; he said note had been stolen; asked me when I paid it; I told him first or fore part of February; told him I had never seen the man before; that I did not know how the man got the note; I first went to desk in sitting room to look for note he had surrendered; did not get note from that desk; got it from another room; I had not seen plaintiff before since note was given; Mrs. Cothran had told me when I came from Buffalo that plaintiff had been at home one day shortly before; he, plaintiff, left for the war in July or August, 1861; I paid the note on the 16th day of February; my daughter was present; he came on the 6th, and again on the 16th; when he was there first I did not tell him how much I could pay; I did not know how much I could pay, with reference to other business; I saw Booth afterwards; he let me have $300, and I gave him canal scrip afterwards, in March; Booth gave me the money from his safe from the 10th to 12th of February; I had $150 to $200 after paying the $1,900; I asked Townsend if a note I had given to a person or bearer, I would be liable to pay to a person holding it; when the man to whom I paid this note first came, he asked me if my name was Mrs. Collins; I said it was; he said he was Mr. Judson; said he had a note payable to George W. Cothran; I said it was my note; he said he had got it under such circumstances that he could afford to throw off the interest if promptly paid; I told him I would see what I could do about it, and would let him know; he said he lived in Buffalo, and would be down again; I never saw the man before; I did not see any one except Townsend and Booth after the man was there before I paid the note; I did not tell either of them about the note; I got $600 of Mrs. Stevenson early in January, some on the 17th when here, and the rest February 3d; I first gave her due bills; last time took up two due bills for $600 and $300; got $300

and gave note for $1,100, payable in one year; took money home and put it in trunk; I got the date of this man's calling from journal on which I entered it as a circumstance that I might want to fix the date; when he called second time I said I had $1,900 and wanted to settle it up; I had not said anything to Marsh about indorsing the note; he had indorsed one for me before this; I never asked Marsh if he knew the man; I wrote note; did not know his given name; asked him what it was; note payable at International Bank, Buffalo; I got money from trunk; man told me he lived in Buffalo; have not seen him since, nor had I before; I supposed plaintiff was in Virginia; his mother told me she had the note soon after it was given; I do not recollect conversation about note in December nor in January; am quite positive I had none, but will not swear I did not have such conversation.

On being recalled testified : The letter written by Mrs. Cothran's grand-daughter was written partly to my little girl, and was not kept; I can not find it; it was that she, Mrs. Cothran, did not intend to transfer the note to Mr. Mann; I wrote in reply to the letter of August 11; I did not intend to say anything of transfering the note.

*Martha Collins* being duly sworn testified : I am the daughter of defendant; I saw the defendant pay that note last February, at her own house in Rochester, the 16th day of February.

On being *re-examined* said witness further testified : She paid it between the hours of nine and twelve o'clock in the forenoon, paid $1,900, four packages of $200 each, making $800, balance loose, one bill $50 ; can not give the others, fives, tens and twenties; gave note for $500 at three years; can not say where the money was got; first saw it in defendant's hands ; I counted it; I was present, and the man she paid it to think he called his name A. W. Judson; never saw him before or since ; I had heard of him before; defendant had told me that a gentleman called with the note

and I supposed it was the same; said he lived at Buffalo; was a stranger to me and to defendant; I first saw him in the sitting room; " the defendant asked the man to whom she paid this note what his name was when she wrote the note; he said A. W. Judson; said he resided in Buffalo; think he put note in his pocket; have counted money for defendant at other times, always when present."

The defendant then rested her case. And after argument of counsel, the court, among other things, charged the jury, that if they should find that the defendant had paid the note, that nothing short of fraud, not even gross negligence, if unattended with bad faith on the part of the defendant, would invalidate the payment so as to take away the rights founded thereon, and the defendant would be entitled to their verdict. To which charge the plaintiff duly excepted.

The court further charged the jury, that although they should find that the note was stolen from the plaintiff by some person, other than the defendant, yet if they found that the defendant had in fact paid it to a holder thereof, their verdict should be for the defendant, unless they found an absence of good faith on her part in the making of such payment. To which charge the plaintiff duly excepted.

The plaintiff requested the court to charge the jury, if they should find that the note was lost by or stolen from the plaintiff, that the payment by the defendant at the time and in the manner alleged, was not a payment thereof as against the plaintiff, and the plaintiff was entitled to recover. To which request the court refused to charge. And the plaintiff duly excepted.

The plaintiff further requested the court to charge the jury that if they should find that the plaintiff had not parted with or transferred his interest in the note at the time of alleged payment, it being then long past due, the payment by defendant at the time and in the manner

alleged was not a payment of the note, and the plaintiff was entitled to recover. To which request the court refused to charge. And the plaintiff duly excepted.

The plaintiff further requested the court to charge the jury, that the alleged payment by defendant being to a stranger, more than six months after maturity of the note, with knowledge that the same was in the hands of the plaintiff long after due, was under circumstances which might reasonably awaken the suspicion of a prudent person. The court refused to charge in the words of this request (having already commented to the jury on these facts). And the plaintiff duly excepted.

The plaintiff further requested the court to charge the jury, that if they found that the alleged payment was made by the defendant under suspicious circumstances, without reasonable caution, and out of the usual course of business, and the plaintiff had not parted with his interest in the note but had been deprived thereof by fraud, the plaintiff was entitled to recover. To which request, and every part thereof the court refused to charge. And the plaintiff duly excepted.

The jury found a verdict for the defendant. And thereupon, on motion of the plaintiff, it was ordered that said plaintiff have leave to make a case with exceptions, to be heard at general term in first instance, and that in the mean time judgment be suspended.

GEO. W. COTHRAN, *plaintiff in person.*

I. The court erred in charging the jury " that if they should find that the defendant had paid the note, that nothing short of fraud, not even gross negligence, if unattended with bad faith on the part of the defendant, would invalidate the payment so as to take away the rights founded thereon, and the defendant would be entitled to their verdict."

1. Because the charge requires that actual fraud must be proved to invalidate the payment. The charge is in the language of section 382 of *Story on Promissory Notes.* A careful examination of the cases (*Crook* agt. *Jadis*, 5 *Barnw. & Adolph.* 908 ; *Backhouse* agt. *Harrison, Id.* 1099 ; *Goodman* agt. *Harvey*, 4 *Adolph. & Ellis*, 869 ; *Uther* agt. *Rich*, 10 *Adolph. & Ellis*, 784 ; *Arbour* agt. *Anderson*, 1 *Adolph. & Ellis, N. S.* 498) cited by *Story* as establishing the doctrines of the text, shows that although Lord DENMAN uses language in giving decisions of some of these cases broad enough to sustain Judge STORY, yet neither of these cases was determined upon the point in question, nor was the point involved in either of these cases. It is submitted that a case is an authority in so far only as it is a judicial determination of the questions actually presented by the facts in the case. And further, the cases cited, and several more recent English cases relate solely to the *transfer* and not to the *payment* of negotiable paper, and Lord DENMAN in several of them fails to discriminate between the law applicable to the transfer of negotiable paper prior to maturity and to that past maturity. And herein consists the false basis of the so called modern English doctrine. The case of *Hall* agt. *Wilson* (16 *Barb. S. C. R.* 548), was determined upon the ground (*p.* 555) that the note was negotiated at an usurious rate of interest, and thereby became void. The elaborate essay of Judge ALLEN upon questions not at all involved in the case, is more interesting than useful or authoritative. In *Magee* agt. *Badger* (30 *Barb.* 246), the question was not up in any legal form. On the trial the judge charged on a point favorable to the defendant as the law would warrant, to which he took an exception, and also had a verdict. In settling the case this exception should have been left out—the party who moved for a new trial having taken no exceptions— still Judge JOHNSON deliberately pronounces a decision upon it, and cites as his authority *Hall* agt. *Wilson* (*supra*).

The question of the effect of a payment of paper past maturity was involved in neither of these cases.

2. The charge was erroneous for the reason that to invalidate the payment, it was only necessary to bring to the knowledge of the defendant at the time of making the payment, facts and circumstances such as ought reasonably to have awakened her suspicions and put her upon inquiry as to the validity of the holder's title. (*Down* agt. *Halling*, 4 *Barn. & Cres.* 330; *Egan* agt. *Trelfall*, 5 *Dow. & Ry.* 324; *Gill* agt. *Cubitt*, 3 *Barn. & Cres.* 466; *Snow* agt. *Peacock*, 2 *Car. & Payne*, 11; *Beckwith* agt. *Corral*, 3 *Bing.* 444; *Slater* agt. *West*, 3 *Car. & Payne*, 325; *Easley* agt. *Crockford*, 10 *Bing.* 243; *Chaumette* agt. *Bank of England*, 9 *Barn. & Cres.* 209; *Strange* agt. *Wigney*, 6 *Bing.* 677; *Howard's Court of Appeals Cases*, 448; *Beltzhoover* agt. *Blackstock*, 3 *Watts' Pa. R.* 20; *Dickson* agt. *Primrose*, 2 *Miles' Pa. R.* 366; *Hunt* agt. *Sanford*, 6 *Yerger, Tenn.* 387; *Sandford* agt. *Norton*, 14 *Vermont*, 228; *McConnel* agt. *Hodson*, 2 *Gilman, Ill.* 640; *Nicholson* agt. *Patton*, 13 *Louisiana*, 213; *Lapice* agt. *Clifton*, 17 *Louisiana*, 152; *Louisiana State Bank* agt. *Orleans Nav. Co.* 3 *Louisiana R.* 1848; *Hall* agt. *Hale*, 8 *Conn.* 336; *Wheeler* agt. *Guild*, 20 *Pickering*, 545; *Cone* agt. *Baldwin*, 12 *Id.* 545; *Sergeant* agt. *Southgate*, 5 *Id.* 311, 317; *Ayer* agt. *Hutchings*, 4 *Mass. R.* 370-1; *Byles on Bills*, 287, 4th *Am. Ed.*)

I shall quote but one of the many English authorities above cited, each of which fully indorses this case. Many of these cases even go further than this, according to the peculiar facts of each. *Gill* agt. *Cubitt* (3 *Barn. & Cres.* 466), was an action on a note that had been stolen, and ABBOTT, C. J., before whom it was tried, charged the jury: " 1st. Whether the plaintiff had given value for the bill, of which there was no doubt; and 2d. Whether he took it under circumstances which ought to have excited the suspicion of a prudent and careful man. If they found that he had taken it under such circumstances, then not-

Cothran agt. Collins.

withstanding he had given the full value for it, they ought to find for the defendant." The jury found a verdict for the defendant, and a rule *nisi* for a new trial having been obtained, the defendant showed cause. The cause was elaborately argued, and opinions were delivered by Chief Justice ABBOTT, and Justices BAYLEY and HOLROYD. HOLROYD says : " I think the rule was correctly laid down to the jury. A party who discounts a bill which had been stolen, is bound to show not only that a good consideration was really and *bona fide* given for the bill, but he must also make it appear to the satisfaction of a jury that he actually took it *bona fide*. *If he takes it with a view to profit arising from interest* or commission, under circumstances affording reasonable ground of suspicion, without inquiry whether the party of whom he takes it came by it honestly or not, then he takes it at a risk, whether the bill be stolen or not; he takes it at his peril. The question whether a bill or note has been taken *bona fide*, involves in it the question whether it has been taken with due caution. If the bill be taken without using due means to ascertain whether it has been honestly come by, the party so taking on himself the risk for gain, must take the consequences if it should turn out that it was not honestly acquired by the person of whom he received it." This was decided in 1824. It should be borne in mind that the defendant paid this note for gain (*Case, fol.* 41).

The first case in this state relating to this point is that of *Johnson* agt. *Bloodgood* (1 *John. Cases,* 51). This was an action by the assignee of the plaintiff, but in the assignor's name, for goods sold and delivered. Plea, non-assumpsit and payment. In an answer to a bill filed against the defendant in chancery, he stated that he purchased the note in question (which he set up in the action at law) some time in the year 1793, without stating the month, at the rate of twelve shillings in the pound, and for the purpose of setting it off against the present demand. *The*

*defendant denied that he had any notice of the assignment
before or after he purchased the note.* At the trial before
Judge KENT, the note was disallowed as a set-off, and on
motion for a new trial, RADCLIFF, J., said : "I consider it
as a principle settled both in England and by our own
practice, that in cases like the present, a court of law will
regard the assignment of a chose in action, and protect
the interest of a *cestui que trust* against every person having
notice of the trust, or who is bound to take notice of it.
If, therefore, the defendant *at the time of obtaining the note,
had notice, or was bound to take notice of the trust created by
the assignment, he ought not to be permitted to avail himself
of the set-off.* The notice by which parties are affected, is
either express or implied ; under the head of implied notice,
it has long been heen held in a court of equity (1 *Atkyns,*
490 ; 2 *Fonbl.* 156,) *that whatever is sufficient to put a party
upon inquiry, is good notice.* This is a just and salutary
rule, calculated to preserve good faith and to protect the
rights of individuals, and whenever the question of notice
occurs, must be equally applicable to courts of law as to
courts of equity. *It has in fact been adopted by courts of
law,* and in cases similar to the present. The defence here
rests upon *a note purchased after it had become due. This
circumstance alone is a ground of suspicion, and has been held
sufficient to make it incumbent on the party receiving the note
to inquire and satisfy himself that it is good. If he does not,
he takes it at his peril,* subject to every equitable defence
in favor of the antecedent parties against whom he may
attempt to enforce it. *The present case is still stronger, for
he purchased the note at a discount.* I therefore think that
in construction of law, *there was sufficint notice to protect
the claims of bona fide creditors.*"

Judge KENT says, in same case : "I approve of the
doctrine, and adopt it as salutary and calculated to pre-
vent fraud, as laid down in the cases of *Brown* agt. *Davis*
(3 *Term* 80), and *Taylor* agt. *Mather* (3 *Term* 83), *that if*

*a bill or note be endorsed after it becomes due, it throws a sus-picion on the transaction, and the endorsee must take it subject to all equities* that existed in favor of the maker of the note, before it was endorsed; and that if there be any attendant circumstance of fraud, the endorsee shall have every pre-sumption turned against him ?" " When a note is offered for sale, after it becomes due, and at a discount, what is the necessary inference ?" " *The law infers the notice,* being what is termed constructive notice; he (the purchaser) ac-cordingly commits a fraud upon his creditors; he does an act *mala fide.*"

Chief Justice LANSING at page 62, says: " Judge BULLER who laid down the broadest principles in the case of *Brown* agt. *Davis,* observes, " that if a note is over due, though he does not say it is not negotiable, *yet it is out of the common course of dealing, and does give rise to suspicion,*" and " in the case of *Taylor* agt. *Mather,* the note was endorsed after it was due, and there were many circumstances, which led the court and jury to conclude, that it was fraudulently obtained; whereupon a verdict was found for defendant. A motion for a new trial was denied on the merits, and BULLER, J., said: " It never has been determined, that a bill or note is not negotiable, after it becomes due; *but if there are any circumstances of fraud in the transaction, and it comes to the hands of a plaintiff by endorsement after it is due, I have always left it to the jury, upon the slightest cir-cumstance to presume the endorsee was acquainted with the fraud.*" Upon which Judge LANSING remarks that, " I know of no cases which have shaken these principles."

The motion for a new trial was denied. This case was decided in 1799.

The case of *Wiggin* agt. *Bush* (12 *J. R.* 306), was an action on a note given by defendant to one Forsaith, in consideration of his withdrawing his objection to the de-fendant's procuring his discharge from his debts. Forsaith endorsed the note to plaintiff. The note, although dated

May 24, was in fact made April 22, and a memorandum of the day upon which it was made was endorsed upon it. Plea, general issue and discharge under insolvent act. Defendant had a verdict, and on motion for a new trial the point was taken by defendant's counsel that "*the plaintiff received the note under circumstances to induce suspicion, and sufficient to put him on inquiry.*"

YATES, J., in delivering the opinion of the court said: "By the endorsement on the note of the real date, the plaintiff had such information as ought to have led to an inquiry into the manner the payee had obtained it, *the post-dating of the note which was indorsed, was an extraordinary circumstance, and must have created suspicion. The neglect of the plaintiff to make any inquiry, ought to subject them to the consequences of the transaction between the defendant and Forsaith*, the immediate or original parties; and as between them, it is decidedly an illegal consideration, and the motion was denied." This case was decided in 1815.

In *Anderson* agt. *Van Allen* (12 *J. R.* 343), the doctrine laid down in *Johnson* agt. *Bloodgood*, is distinctly affirmed. Ch. J. THOMPSON says it is "well settled that actual notice is not necessary. *If a party acts in the face of facts and circumstances which were sufficient to put him upon inquiry, he acts contrary to good faith and at his peril.* These principles are fully recognized by this court in *Johnson* agt. *Bloodgood.*" This case was also decided in 1815.

The same question was discussed by the superior court of New York in *The Fulton Bank* agt. *The Phœnix Bank* (1 *Hall*, 562). This was an action to recover on a post-note issued by defendant, which had been deposited in the mail at Charleston, to be transmitted to New York, but the mail was robbed, and the note passed into the hands of Prime, Ward, King & Co., who deposited in plaintiff's bank, which credited them with the amount of it, but which had not been drawn out. On presenting the note for payment to defendant, it was refused on the ground that the note had

been stolen, and the real owner had notified them not to pay it. The plaintiff recovered, but on motion for new trial, Judge HOFFMAN says at page 571: "It is a rule of law well settled, that possession of a promissory note, endorsed in blank, or payable to bearer, is *prima facie* evidence of ownership, and if the person or party having the possession, came by it *bona fide*, for a valuable consideration, in the course of his business, and without any accompanying circumstances of suspicion to put him upon his guard, or excite inquiry, he shall hold the note against the original owner, even if it had been lost or stolen. *But it is equally well settled that if the holder of the note received it under circumstances which ought to put a man of ordinary prudence upon his guard, or at least upon inquiry;* or if he came into a possession of it without having parted with anything of value, or without having given some new credit in exchange for the note, *then the maker may,* under proper equitable circumstances, *set up a defence against his right of recovery,*" and he cites *Gill* agt. *Cubitt,* 3 *Barn. and Cressw.* 466; and *Bay* agt. *Coddington,* 5 *Johns. Ch. R.* 56.

A new trial was granted, and as appears by a note at the end of the case, the case was abandoned. This was in 1829.

The case of *Brown* agt. *Taber* (5 *Wend.* 566), goes much further than the court is called upon to go in this case. That was an action in which plaintiff sought to recover as endorsee of a note payable at a bank in sixty days, made by Groat to order of and endorsed by defendant. The note was endorsed for the accommodation of Groat, to enable him to redeem the property of one of his neighbors taken in execution; it was offered for discount at the bank by a son of the defendant, and on the bank refusing to discount it, it was returned to Groat. When it had but eighteen days to run, Groat attempted to raise money on it at the lottery and exchange office of the plaintiff, the

clerk refused to cash the note, but on Groat's application, sold him twenty-three lottery tickets at $5 per ticket, and received the note in payment; $5 was the usual retail price for lottery tickets, except to *dealers*, to whom they were sold for $4; the clerk knew that Groat was not a dealer in tickets; he was told by Groat that he had been in the bank with the note, but did not say for what purpose; the note had on it *bank marks*, *i. e.* the name of the maker, and time when payable, in the hand-writing of one of the bank clerks. A verdict was taken subject to the opinion of the court.

The court per MARCY, J., says that "Groat, by putting the note in circulation, acted in bad faith towards the endorser; and if the person who received it of him knew the circumstances under which it was passed, or is to be considered chargeable with notice, the plaintiff can not recover. It is not pretended that the clerk of the plaintiff who received the note had actual knowledge of the misappropriation of it; but it is insisted by defendant *that he knew such facts and circumstances as should have put him on inquiry.* We are therefore to say whether the evidence was sufficient to charge the plaintiff with notice of Groat's improper conduct in putting off the note. The plaintiff was a dealer in lottery tickets, and the note was received in payment for tickets sold Groat; the note was therefore received, it is said in the due course of business. Even if so received, there may be attendant circumstances destroying the *bona-fides* of the transaction." And the court held that sufficent circumstances were brought home to the plaintiff to have put him upon inquiry; and judgment was given to the defendant. This was in 1830.

In *Wardell* agt. *Howell* (9 *Wend.* 170), the English case, *Gill* agt. *Cubitt* (3 *Barn.* and *Cres.* 466), is cited by Justice SUTHERLAND, with approval. This was in 1832.

*Pringle* agt. *Phillips* (5 *Sandf.* 157), is perhaps the leading case in point of ability. It goes to the full extent

claimed to establish our point, affirming the doctrine of *Gill* agt. *Cubitt*, and the cases that I have cited. The particular attention of the court is called to this case.

In *The Belmont Branch Bank* agt. *Hoge* (7 *Bosw.* 543), the case of *Pringle* agt. *Phillips*, is adopted and followed in the three able opinions there delivered.

The question was incidentally before the court of appeals in *Davis* agt. *McReady* (17 *N. Y. R.* 230). That was an action by an indorsee against acceptor of a bill taken before due and for value. At the time he purchased it he was informed that the consideration was an executory agreement by vendor to make necessary repairs to render a brig sea-worthy. The question that he purchased it under circumstances that should have put him upon inquiry was raised, but the court held that the consideration for the acceptance being legal, and that at the time of the transfer the contract to repair being yet executory, and no breach having transpired, that a subsequent breach of the contract in neglecting to make the proper repairs, did not affect plaintiff's title. Denio, J., says "a party receiving a bill is not put upon inquiry unless circumstances of suspicion have come to his knowledge." And this is said concerning the transfer of a bill before due and for value.

The case of *The Louisiana State Bank* agt. *Orleans Navigation Co.* (3 *Louis. Repts.*), decided in 1848, much later than the English cases, is a very strong case in favor of the plaintiff in this case. It is there held that "Express notice is not necessary to charge the holder with what the law considers to be notice of any defect or infirmity in a note or bill so as to let in a defence against a holder for value; it is sufficient, if the attending circumstances are of such a character as to cast a shade on the transaction and to put the holder on inquiry."

3d. Because if at the time of making the payment, the defendant had notice of the infirmity of the holder's title, the payment was nugatory.

The case of *Williamson* agt. *Brown* (15 *N. Y. R.* 354), although a case pertaining to real property, establishes the rule that must necessarily dispose of this case. It determines beyond all possibility of doubt, that the question is not one of fraud but of good or bad faith. Bad faith is not synonymous with fraud; bad faith involves moral turpitude only, while fraud is an indictable offence; and it is a principle of universal application that a party can not establish a defence based upon her own *mala fides*. *Mala fides* is the absence of good faith; but it does by no means always follow that a party not exercising good faith is necessarily guilty of a fraud. Therefore, if the defendant, at the time of making the alleged payment had notice of the infirmity of the holder's title to the note—if she was in possession of facts and circumstances sufficient to put her upon inquiry in that behalf, and omitted to make all necessary and proper inquiries—it is a case in which the law declares that she had notice—and a failure to make proper inquiries to ascertain whether the holder was entitled to receive payment of the note, was such an absence of good faith as would deprive the alleged payment of all force as against the plaintiff.

At page 362, SELDEN, J., says: "The true doctrine on this subject is that where a purchaser has knowledge of any fact, sufficient to put him on inquiry as to the existence of some right or title in conflict with that he is about to purchase, he is presumed either to have made the inquiry, and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his claim, to be considered as a *bona fide* purchaser.

*Parsons* in his recent *Treaties on Bills and Notes*, after an elaborate discussion of the authorities, lays down the law thus: "The *bona fide* holder of a lost, stolen or tortiously transferred note or bill, transferable by mere delivery, and not over due or otherwise apparently dishonored, who has taken it without knowledge, or actual or construc-

tive notice of the loss or fraud, in the usual course of business, and for a full and valuable consideration, has a perfect title to that bill or note against the true owner." (2 *Parsons on Bills and Notes*, 279; *Bay* agt. *Coddington*, 20 *J. R.* 637.)

This is unquestionably the law, plainly and succinctly stated. But the learned commentator has here stated a proposition applicable to bills or notes transferred before maturity, and not at all applicable to those transferred *after* maturity; for he says on the same page, " where the defect in title appears on the face of the lost or stolen instrument at the time of the transfer, as where it is transferred *after it is due* (*Down* agt. *Halling*, 4 *Barn. & Cres.* 330; *Weathered* agt. *Smith*, 9 *Texas*, 622), or after dishonor, the party obviously has constructive notice of his assignor's infirmity, and can have no better title than he. It is an obvious case of transfer with notice, and follows the ordinary rule of paper over due, or otherwise defective." (*Ayer* agt. *Hutchins*, 4 *Mass.* 370; *Wiggin* agt. *Bush*, 12 *J. R.* 306; *Fowler* agt. *Brantly*, 14 *Peters*, 318; *Goodman* agt. *Simons*, 20 *How.* 343.)

*Down* agt. *Halling* (*supra*), was the case of a lost check taken by the defendant, a shopkeeper, in the usual course of business, in payment of goods, giving the balance in change *five days after date*. In an action brought by the person who had lost the check against the shopkeeper (he having drawn the money on it), it was held that the jury were properly directed to find for the plaintiff if they thought the defendant had taken the check under circumstances which ought to have excited the suspicion of a prudent man. BAYLEY, Justice, says: " I think this case was left to the jury very favorably for the defendant. There is no question whatever in the case, if the distinction between bills over due and not due be adverted to. If a bill, note or check, be taken after it is due, the party taking it can have no better title to it than the party from whom

he takes it; and, therefore, cannot recover upon it if it turns out that it has been previou ly lost or stolen." Hol-ROYD, J., says : " This check must be considered in the same light as a bill taken after it is due. Now it has been frequently held that a party taking such a bill or note, takes it at his peril. In many of the cases where the title to stolen bills or notes has come in question, *they have been taken before they were due*, and *then* it may have been a proper question to submit to the jury whether they were taken *mala fide* or *bona fide*." And Abbott, C. J., says : " The check came into the hands of the defendant five days after its date. We are of opinion that an instrument of this nature coming to the hands of a party *so long after its date*, is to be considered in the same light as a bill of exchange over due, and in such a case it is incumbent on the party who takes the instrument under such circum-stances, to show *that the party from whom he took it had a good title to it*." At the time of the alleged payment in this case, the note was *seven months past due !*

If these cases are to be followed, and I have met with no case in which they are even questioned, and I have examined about every reported case in England and the United States bearing upon this question, there cannot be a doubt but what the charge was erroneous, and that the plaintiff was on the evidence entitled to a verdict. The cases in this state cited under my second proposition, have never been overruled or even questioned. I have no doubt but what Judge Story, in laying down the rule as con-tained in the charge in this case, had reference solely to promissory notes transferred before maturity. While his doctrine as pertaining to that class of transfers may be substantially correct, yet the authorities cited by him do not sustain his text. The rule is correctly laid down by Parsons, as above quoted. The fundamental error of Lord Denman's doctrine is, that he does not discriminate between the negotiation of bills before maturity and after maturity.

As applied to the former his doctrine is substantially sound, while as to the latter it is simply absurd.   And here consists the principal error in the charge.

II. The court erred in refusing to charge the jury when requested by the plaintiff, " that if they should find that the note was lost or stolen from the plaintiff, that the payment by the defendant at the time and in the manner alleged, was not a payment thereof as against the plaintiff, and the plaintiff was entitled to recover." If I have correctly stated the law in my first point, that if the payment was made under circumstances which ought reasonably to have excited defendant's suspicion, and led her to inquire, and by failing to make proper and necessary inquiries to ascertain the extent of the holder's right to the note, there was an absence of good faith in making the payment, and that by accepting a transfer of the note long after due, she had notice of the infirmity of the holder's title.   It follows as a natural sequence that if the facts and circumstances known to her at the time were sufficient *to have actually excited her suspicions and put her upon inquiry*, and she neglected to make proper effort to ascertain whether or not the holder was entitled to receive payment, in making the payment there was not only an absence of good faith in her, but positive bad faith.

To incontestably establish the fact that her suspicions *were aroused* by the circumstances under which payment was demanded, *to such an extent as to put her upon inquiry*, it is only necessary to refer to her own testimony, from which (*fol.* 35 *and fol.* 40) it appears that *she actually sought the advice of an attorney.*   The rule is well established that " a party in possession of certain information will be chargeable with a knowledge of all facts which an inquiry, suggested by such information, prosecuted with due diligence, would have disclosed to him." (*Williamson* agt. *Brown,* 15 *N. Y. R.* 354, 364 ; *Whitbread* agt. *Boulnois,* 1 *You. & Coll. Ex. R.* 303 ; *Kennedy* agt. *Green,* 3 *Myl. &*

*Keene*, 699 ; *Howard Ins. Co.* agt. *Halsey*, 4 *Sandf. S. C. R.*
565 ; *Small* agt. *Smith*, 1 *Denio*, 583.) It therefore became
a question of law for the court, and not of fact for the jury
to determine—the defendant having by her own testimony
convicted herself of an act of bad faith in paying the note
under the circumstances under which it was paid. The
plaintiff was entitled to the charge.

When her suspicions became aroused—when doubt rose
in her mind as to her right to pay the note to this stranger
under the circumstances of the case—bearing in mind that
the plaintiff had been her counsel, and manager of her
business for years, and was then absent in the army of the
Potomac, and that she was intimate in plaintiff's mother's
family ; that they resided but two hours' ride on the cars
distant from her, between whom there was communication
by mail twice a day ; she having been informed by Mrs.
Cothran but a short time previous to this stranger's pre-
senting this note, that plaintiff had left it with her to live
upon in case he never returned from the army ; I say, does
not the law demand of her that in the exercise of good
faith towards the plaintiff, she should have made the inquiry
of Mrs. Cothran whether or not the note had been trans-
ferred. Had she made the inquiry, the whole fraud would
have been detected at once. But instead of making the
slightest inquiry in the direction where she knew she would
readily have been informed of the larceny, she studiously
avoided making any inquiry at all, and in that she was
guilty of bad faith, which is entirely fatal to her defence
(*Williamson* agt. *Brown*, 15 *N. Y. R.* 354; *per* PAIGE, *J*).

It has frequently been determined in our court of appeals
and supreme court, in actions to recover damages for
injuries occasioned by negligence, that if the negligence
of the plaintiff contributed to the injury, that his action
cannot be sustained. As a corollary from the above, does
it not follow that if the defendant's want of good faith in
any manner contributed to the perpetration of this fraud

upon the plaintiff, her defence is unavailing, and the alleged payment a fraud.

III. The court erred in refusing to charge the jury " that if they found that the alleged payment was made by the defendant without reasonable caution, and out of the usual course of business, and the plaintiff had not parted with his interest in the note, but had been deprived thereof by fraud, the plaintiff was entitled to recover." A payment in the usual course of business means a payment by the proper person to the lawful holder at the maturity of the paper, and at the place where it is payable. (2 *Parsons on Bills*, 208 ; *Story on Promissory Notes*, §§ 275, 380.) A payment out of the usual course of business is always at the peril of the party paying, and payment of a note long past due is a payment out of the usual course. (*Byles on Bills*, 288, *4th Am. Ed.* ; 2 *Parsons on Bills*, 212.)

A party purchasing a piece of paper past due takes it as a dishonored paper, and subject to any defence that may exist between the original parties. And for that matter it makes no difference whether he purchased it in good faith or in bad faith. He has taken it out of the usual course of business. A note past due has a cloud of dishonor attached to it, and it has ceased to come within the protection that the law affords to commercial paper negotiated before due. (*Wheeler* agt. *Guild*, 20 *Pick.* 545 ; *Down* agt. *Halling*, 4 *Barn. & Cres.* 330.) And a party paying a note long past due occupies no better position than a party purchasing. In fact, it is laid down in *Byles on Bills* (288, note *h*), that " there is at present no authority for saying that a party honestly paying, is in as good a situation as a party honestly discounting."

A payment without reasonable caution means a payment made in the absence of good faith. Reasonable caution and good faith mean substantially the same thing, except that the former is embraced in the latter. For it cannot be said that a party acts in good faith who does not exer-

cise reasonable caution in his business transactions. A party cannot close his eyes to facts and circumstances brought home to his knowledge, from which he must have known the existence of facts entirely inconsistent with what he claims, and then claim that by reason of his having avoided making any inquiry, he acted in good faith.

There was a circumstance connected with this note that was not only suspicious to the last degree, but a circumstance from which *she must have known* that this holder had fraudulently acquired possession of this note. When he presented the note to her it had *the forged indorsement of plaintiff's name upon it.* This was not *a* circumstance merely—an inference—but *a fact;* a fact not only sufficient to excite suspicion as to the holder's title to the note, but a fact that must have carried conviction home to her mind that he had acquired it dishonestly. She knew plaintiff's hand writing as well as she did her own, for he had been doing business for her for years. At folio 45, she testifies relating to this forgery, *"never saw it until I took my name off;* I think it is plaintiff's handwriting; looks like it; won't swear to it."

" Never saw it until I took my name off!" Don't that tell the whole story ? Determined to shut her eyes to every fact or circumstance, she was intent only on getting her name off from the note, after which she could look round, see fraud standing out all over the transaction, and say, well I paid the note in good faith, my name is off, and no matter if it had a forged indorsement on it, and that the circumstances under which the payment was made were sufficient to stamp the whole transaction with fraud and bad faith, yet I did not think so " until I took my name off." It is substantially conceded all through the case— proved beyond the possibility of doubt, that the plaintiff never parted with his interest in the note, but that it was stolen from him. The learned judge before whom the cause was tried, remarked in submitting the case to the

jury, " that it seemed to be conceded on all hands that the note had been stolen from plaintiff's house."

The case of *Williamson* agt. *Brown* (*supra*), establishes the law that a party being possessed of information, is chargeable with a knowledge of all the facts which an inquiry suggested by such information, prosecuted with due diligence, would have disclosed to him; and the case of *Johnson* agt. *Bloodgood*, having held that a party purchasing a note long past due took it at his peril, and did an act *mala fide*; and *Brown* agt. *Taber*, having determined that a party purchasing a note with the maker's name and the date of maturity marked thereon by a banker's clerk, and the note not yet due, had sufficient notice of the infirmity of the holder's title to defeat his recovery thereon, notwithstanding he paid full value. I contend that inasmuch as this case is so much more favorable to the plaintiff than either of those cases, he was entitled to the charge as requested.

IV. The court erred in refusing to charge the jury " that the alleged payment by defendant being to a stranger, more than six months after maturity of the note, with knowledge that the same was in the hands of the plaintiff long after due, was under circumstances which might reasonably awaken the suspicion of a prudent person." The fact that the note was long past due, was a circumstance sufficient to excite the suspicion of a prudent person. (*Johnson* agt. *Bloodgood*, 1 *Johns. Cases*, 51; *Brown* agt. *Davis*, 3 *Term R.* 80; *Taylor* agt. *Mather*, *Id.* 83; *Brown* agt. *Taber*, 5 *Wend.* 566; *Down* agt. *Halling*, 4 *Barn. & Cres.* 330.) It was a dishonored note, and out of the usual course of business.

The fact that defendant knew that the note was held by the plaintiff a long time after it had matured, was sufficient to have awakened her suspicion when it was presented by a stranger—she knowing at the time of the presentment that plaintiff was absent in the army. The fact

that the note was presented by a stranger whom defendant had neither seen or heard of before; the note being for so large an amount, and he declaring that he had got it under such circumstances that if promptly paid he could afford to throw off the interest, about an hundred dollars. Would it not reasonably awaken the suspicion of any solvent honest person, to have an utter stranger approach him and say, sir, I hold a note against you for $2,400, which is past due over six months, but I got it under such circumstances that if promptly paid, I can afford to throw off the interest? And all this too, before the maker had in the least pleaded time or his inability to pay.

Isn't it a little suspicious that he should propose to throw off over $100 before he asks for payment at all. Let us see what she says about this transaction. At fol. 41, she testifies: "When the man to whom I paid this note first came, he asked me if my name was Mrs. Collins, I said it was; he said he was Mr. Judson; said he had a note payable to George W. Cothran; I said it was my note; he said *he had got it under such circumstances that he could afford to throw off the interst if promptly paid;* I told him I would see what I could do about it, and would let him know; I never saw the man before; when he came the second time, I told him I should be unable to pay him more than $1,900, and asked him to take note for $500 *at three years;* I asked him if he considered it prompt enough to throw off the interest; he said he did."

If his proposition to throw off an hundred dollars of interest if promptly paid, was a ground of suspicion, wasn't it doubly suspicious — didn't it stamp the transaction with fraud, when he said that $1,900 in money and a bare promissory note at three years — a thing so unusual and out of the usual course of business — was payment sufficiently prompt to induce him to throw off an hundred dollars of interest on a note then long past due, and against a person of such extensive means and undoubted credit as

Mrs. Collins? Did he not know that he could have enforced payment at once? Was not the fact that she, on so short a call, had produced $1,900, evidence sufficient to satisfy his mind that the note was good? Why then take a new note, and at three years? Why not indorse the payment on the note, and hold it instead of taking a new one? The answer is obvious to the least thinking mind. He had acquired possession of the note fraudulently and wanted to get rid of it, and she wanted to get her name off from the note before the discovery by the plaintiff of the larceny.

Can any honest man after carefully reading her evidence, say that he believes that she acted in good faith in making this payment? or even that she ever made any payment at all in fact, but rather that this whole affair of payment was a mere device, manufactured by a crafty and designing woman, who had acquired possession of the note herself in a surreptitious manner, that she could avail herself of the testimony of her daughter to defeat a recovery on the note, and a conviction on the charge of larceny. Do you believe her when she testifies that she didn't take this note from Mrs. Cothran's house? . Do you believe when she testifies that she paid this note in good faith, that she testifies truly? Had any other person than Mrs. Collins stolen this note, do you think that the gold and silver that lay loose in the same drawer would not have been taken also?

V. The court erred in refusing to charge the jury, "that if they should find that the plaintiff had not parted with or transferred his interest in the note at the time of the alleged payment, it being then long past due, the payment by defendant at the time and in the manner alleged was not a payment of the note, and the plaintiff was entitled to recover."

1. Payment of a note long past due, is payment with notice of the infirmity of the holder's title. (*Johnson* agt.

*Bloodgood*, 1 *John. Cases*, 51 ; *Down* agt. *Halling*, 4 *Barnw. and Cres.* 330 ; 2 *Parsons on Bills and Notes*, 279.)

2. And having notice of the holder's want of title, and not having availed herself of the information thus afforded her, but studiously avoided to make any inquiries, she is not only chargeable with a knowledge of the holder's want of title, but is guilty of bad faith in making the payment. (*Williamson* agt. *Brown*, 15 *N. Y. R.* 354.)

3. Payment of a note long past due is a payment at the peril of the party making it, and if it turns out that the note had been stolen, as it did in this case, it is no payment at all as against the rightful owner. (2 *Parsons on Bills and Notes*, 213 ; *Scholey* agt. *Ramsbottom*, 2 *Camp.* 485 ; *Natierville* agt. *Stevens*, 2 *How. Miss. R.* 642.)

S. E. CHURCH, *for defendant.*

I. The title of the holder of negotiable paper for a valuable consideration, is not affected by the fraud of a prior party in the absence of actual notice without proof of bad faith on the part of the holder.

1. This was the original rule established in England. (*Miller* agt. *Race*, 1 *Bur. R.* 452 ; *Price* agt. *Neal*, 3 *Bur.* 1355 ; *Peacock* agt. *Rhodes*, 2 *Doug.* 633 ; *Lawson* agt. *Weston*, 4 *Esp.* 56 ; *Morris* agt. *Lee*, 2 *Raymond*, 1396.)

2. This rule was afterwards partially varied so that the title of the holder of negotiable paper would not be protected when it had been acquired under circumstances which ought to have excited the suspicions of a prudent and careful man. (*Gill* agt. *Cubitt*, 3 *Barn. & Cres.* 466 ; *Warren* agt. *Halling*, 4 *Barn. & Cress.* 330 ; *Snow* agt. *Peacock*, 2 *Car. & Payne*, 215).

3. The rule was again modified, and it was held that *gross negligence* was necessary to impeach the title of the holder of negotiable paper. (*Crook* agt. *Jadis*, 5 *Barn. & Ad.* 909 ; *Backhouse* agt. *Harrison*, Id. 1098.)

4. Finally the original rule was restored, and it was decided and settled that the title of the holder would not be invalidated except upon proof of *bad faith*. *Goodman agt. Harvey* (4 *Adolp. & Ellis*, 870), is the leading case, and Lord DENMAN, C. J., in delivering the opinion, said: " The question I offered to submit to the jury was whether the plaintiff had been guilty of gross negligence or not. I believe we are all of opinion that gross negligence only would not be a sufficient answer where the party has given consideration for the bill. Gross negligence may be evidence of *mala fides*, but it is not the same thing. *We have shaken off the last remnant of the contrary doctrine*. When the bill has passed to the plaintiff, without any proof of *bad faith* in him, there is no objection to his title." In *Utter agt. Rich* (10 *Adolp. & Ellis*, 784), Lord DENMAN said, three years later (1839): " With respect to the doctrine laid down in *Gill agt. Cubitt (supra)*, and other cases, we adhere to the more recent decisions, and to what is said in *Goodman agt. Harvey*, that gross negligence alone would not be a sufficient answer; that it may be evidence of *mala fides*, but is not the same thing." (*See also Arbonin agt. Anderson*, 1 *Adolp. & Ellis*, *N. S.* 498; *Stephens agt. Foster*, 1 *Cromp. Mess. & Ros.* 849; *Palmer agt. Richards*, 1 *Eng. Law and Eq. R.* 529; *Marston agt. Allen*, 8 *Mees. & Wels.* 494; *Raphard agt. Bank of England*, 33 *Eng. Law and Eq.* 276; *May agt. Chapman*, 16 *Mees. & Wels.* 355; *Chitty on Bills*, 12 *Ed.* 257; 1 *Saund. Pl. and Ev.* 591; *Byles on Bills*, 4 *Am. Ed.* 121 *to* 126.)

5. The rule thus restored and established in England, has been uniformly adopted in this country, and must be regarded as settled law. (*Story on Bills*, § 416; *Story on Notes*, § 382; *Edwards on Bills*, 309; *Goodman agt. Simonds*, 20 *How. U. S.* 343; *Hall agt. Wilson*, 16 *Barb.* 550; *Magee agt. Badger*, 30 *Barb.* 264; *Wooster C. Bk. agt. Dorchester Bk.* 10 *Cush.* 488; *Saltmarch agt. Tuthill*, 13 *Ala. R.* 390; *Wheeler agt. Guild*, 20 *Pick.* 545; *Brush agt. Sinclair*, 11

*Conn.* 368; *Gwinn* agt. *Lee,* 9 *Gill,* 138; *Matthews* agt. *Raythess,* 4 *Geo. R.* 287.)

The opinion of DUER, J., in *Pringle* agt. *Phillips* (5 *Sand.* 157), is mere *obiter,* so far as the question under examination is concerned. That case related to personal chattels. In *Arbonin* agt. *Anderson* (*supra*), PATTERSON, J., in speaking of a similar case, said : " That was a case where cattle had been fraudulently obtained. *Goods are one thing, negotiable instruments another.*" There is no authority for saying that the property in a negotiable instrument might not pass from a party who stole it.

Judge DUER's opinion has been expressly repudiated by every recent American case and elementary writer (*authorities before cited*). See also 2 *Parsons on Notes and Bills,* 279, where the whole question is elaborately and ably discussed, and in the text and notes of all the authorities both English and American (including the *obiter* opinion of Judge DUER), cited and commented upon, and the conclusion stated that the law is settled both in England and America, as follows : " The title of such holder is not defeated by proof that he was negligent, or even grossly negligent in taking the note or bill, and that he omitted to make inquiries which common prudence would have dictated. But while gross negligence is not itself *mala fides,* it may be evidence thereof for a jury."

II. The rule protecting the holder of negotiable paper, as now settled, should be extended even with more favor to the payment of a note or bill by a maker or acceptor, and the charge of the court was therefore clearly right, and no stronger than the uniform and established rule required (*see authorities before cited*). The charge was in the language of *Story on Bills, section* 382. *Edwards on Bills,* 538, states the same rule explicitly. He says : " And the rule appears to be now well settled that nothing short of fraud or bad faith in the party paying a note or bill will render the payment ineffectual. It has been held that even

gross negligence, unaccompanied by bad faith, will not defeat the title of a purchaser for value, *and there is no ground* for requiring of the maker or acceptor, or his agent, anything more than good faith in the payment of a note or bill." The word notice means the same as knowledge (20 *How.* 365, *per* CLIFFORD, *J*). If the maker *knew* that the holder stole the note, or obtained it fraudulently, or found it, or held it under such circumstances as would prevent *his* recovering it, then the payment would be in bad faith, otherwise not. It is well settled that *mala fides* only will prevent a recovery by the holder. (*Comstock* agt. *Hoag*, 5 *Wend.* 600; 6 *Mass.* 430.)

III. The several requests to charge were properly refused by the court.

1. The first request was that if the jury should find that the note had been stolen, then the payment was invalid.

2. That if the jury should find that the plaintiff had not parted with his interest in the note, it being past due, then the payment was invalid, and the plaintiff was entitled to recover.

3. That the payment being to a stranger, with knowledge that the same was in the hands of the plaintiff after due, was under circumstances which might reasonably awaken the suspicion of a prudent person.

The court refused to charge in these words, having already commented to the jury on these facts. 1. It was a disputed fact on the trial whether defendant did know that plaintiff held the note after it was due ; and if that was material, it is presumed that the court charged accordingly. 2. But it was immaterial whether the plaintiff knew that the holder obtained it after it was due or not. It was necessary to know that the holder had no title. 3. A conclusive answer to the request is, that it was of no consequence whether the circumstances would " *awaken the suspicions of a prudent person* " or not. We have seen that suspicion is not sufficient to defeat a payment. 4. But the

court did put all these circumstances to the jury for them to consider on the question of bad faith.

4. The last request was, that if the jury found that the payment was made under suspicious circumstances, without reasonable caution, and out of the usual course of business, and the plaintiff had not parted with his interest in the note, but had been deprived thereof by fraud, the plaintiff was entitled to recover.

This is sufficiently answered by previous points and authorities. It is presumed that the court charged correctly on all other subjects not specifically stated.

IV. A new trial should be denied, with costs.

By the court, GROVER, J. The only questions in this case arise upon the exceptions to the charge of the judge, and to his refusals to charge as requested. These exceptions present the question whether payment of a note, which has been lost or stolen from the owner, by the maker to the finder or thief, without fraud; in other words, under the belief that he was the true owner, but under circumstances showing that the maker was grossly negligent in not learning the facts, and which would have excited suspicion in an ordinary person, is available as a defence against the real owner.

The judge upon the trial held, and so instructed the jury, that such payment constituted a defence against the owner. Such I understand to be the fair construction of the charge. The plaintiff insists as one ground why such payment is not good, that it was made after the note became due. It is well settled that a party purchasing a note or bill after the same becomes due, takes it subject to all defences the maker or other parties would have against the party from whom he purchases. But this doctrine, I think, has no application to payment made to a party in possession, by the party liable. The rule as to a purchaser is founded upon a presumption that valid notes or bills are

paid by the parties liable thereon at the time they become due, and that non-payment at that time is notice to all subsequently acquiring title to the paper, that the same is for some reason invalid, or that there is no subsisting cause of action thereon. But the maker of a note has no reason for supposing from the fact that he has not paid the same when due, that the title of the possessor is invalid. Indeed, notes are very rarely paid before due, and cases of presentment for payment before that time are still more rare.

At one time it was the rule in England that payment made to a purchaser or a party in possession, under circumstances calculated to excite the suspicions of a prudent man as to his ownership, was not good as against the real owner who had lost the paper, or from whom it had been stolen (*Gill* agt. *Cubitt*, 3 *Barn. & Cress.* 466). Quite a number of cases were decided in the same way upon the authority of that case, applying the same rule. In late cases the English judges modify the rule by holding that circumstances calculated to excite suspicion of a prudent man by a purchaser of a bill or note *before due*, was not sufficient to destroy the title of the purchaser, but to have that effect such purchaser must have been grossly negligent (*Crooks* agt. *Jadis*, 5 *Barn. & Adolp.* 909). Finally, in still later cases, the rule was still further modified by holding that such purchaser must purchase in bad faith, and that gross negligence was not sufficient to destroy his title. (*Goodman* agt. *Harvey*, 4 *Adolp. & Ellis*, 870 ; *Uther* agt. *Rich*, 10 *Adolp. & Ellis*, 748.) These cases relate to the title of a purchaser before due, of a lost or stolen paper. I think the rule should be the same in case of payment by the party liable, though made after due, as in the case of a purchaser before due.

We have seen that notes are not paid until or after due usually, and there is surely as much reason that the party liable should be unembarrassed in making payment, and

that he should be protected in paying to one in possession, and *prima facie* entitled to receive it, as that a purchaser in the usual course of business, for value, should be protected in his title. Indeed, if any distinction should be made, I think the rule should be more favorable to the party making the payment. He must act at once, not only to preserve his credit but to protect himself from the trouble and expense of a suit, while the purchaser would merely lose a bargain.

The doctrine of the charge is fully sustained by *Story on Notes, section* 382; *and Id. on Bills, section* 438; and by *Edwards on Bills,* 538. The same doctrine is recognized in *Hall* agt. *Wilson* (16 *Barb.* 548), and in *Magee* agt. *Badger* (30 *Barb.* 247). The weight of authority is decidedly in favor of the doctrine held by the judge in his charge. Upon principle, I think that doctrine correct. There would be no safety in paying paper to anybody but the payee, if in determining the validity of such payment an inquiry must be gone into whether the party making it has been negligent, or whether the circumstances would have excited the suspicions of a prudent man. If such was the law, parties liable on commercial paper would often be greatly embarrassed. But adopting the text of the charge, that the payment should be held valid unless the party making it did so fraudulently; in other words, made it in bad faith, or presuming that the person to whom it was made was not the owner, we have a fixed determinate rule that can never leave the party liable to pay in doubt as to what course to adopt. He will not be compelled to run the hazard of an uncertain law suit. Indeed, I think that if the court should adopt the rule that a party should not be protected in paying his paper to the possessor, when the circumstances were such as to excite suspicion as to his ownership, or put him on inquiry, they ought to hold that such facts constitute a defence to an action brought by such possessor, although the real owner, until a reasonable

time had elapsed for making the inquiry, otherwise the law would cast upon the party liable the burden of either losing his money if he paid, and it turned out that the possessor was not the owner, or if he refused, to pay the costs of a law suit if it turned out he was the owner. Yet no one will contend that such circumstances will sustain a defence for a moment. A holder of a negotiable note is not required to present any evidence of ownership other than the possession, to authorize him to demand and receive payment. Hence, I think, it follows that the charge is correct.

The plaintiff's motion for a new trial must be denied.

DANIELS, J., *dissenting.* The plaintiff brought this action to recover the amount due upon a promissory note made by the defendant on the 15th of July, 1862, payable in twenty days to the plaintiff or bearer, with semi-annual interest. It remained in his possession and in the possession of his mother for him, until after January 12th, 1863, and between that time and the 16th of February, was feloniously stolen, and on that day was paid by the defendant to a stranger, who derived title under the person committing the theft.

The evidence tends to show that the defendant knew the note continued to be owned by the plaintiff after it became due. There would probably be no impropriety in assuming such to be the fact, since in addition to the other evidence on that subject, she substantially concedes it in her letter written under date of the 11th of August. But that assumption is not necessary, for she has been exonerated from the plaintiff's claim by payment to the person who held the note. It is true as a general proposition, that not even gross negligence, if unattended with *mala fides* on the part of the maker or other party paying the note, will invalidate the payment so as to take away the rights founded thereon. (*Story on Promissory Notes*, § 381; 2 *Parsons on Bills and Notes*, 272, 273.) But in order to

bring the present case within the protection of this rule, the payment should appear to have been made *at the maturity of the note*, or so near that time as to show that the holder acquired it before it became due. The rule declared by *Chitty* in his work on *Bills*, at page 394, is as follows: " In general, when the holder of a bill or note indorsed in blank or payable to bearer, loses or is robbed of it, and the person finding or stealing it presents it to the drawer *at the time it is due*, and he pays it *bona fide, in the course of business*, without knowing of the loss or robbery, such payment will discharge him." (*See also pp.* 255, 256.) The rule is stated in the same manner by *Parsons, Bills and Notes* (*vol.* 2, 212, 213). He says: " Payment to a wrong party of a note or bill long dishonored, or of a check long after it was drawn, does not discharge the payer." If payment be made either before the paper matures or long after it has become due, *it is made out of the usual course of business, and will not discharge the party paying, unless to a person actually entitled to receive the money*. (*Byles on Bills*, 271 ; *Story on Promissory notes*, § 384 ; 2 *Parsons on Bills and Notes*, 214, 215.) This is implied by *Chitty*, in his statement of the rule.

When a person presents the bill or note for payment at its maturity, his apparent right to payment indicated by the production of the paper, is sufficient to entitle the maker or acceptor to rely upon his title in making payment. Any other rule would be inconvenient in the transaction of the affairs of business where negotiable paper is made to perform many of the offices of currency. If the maker or acceptor were bound to ascertain at the peril of making payment again, the actual rights of the person who demands it at maturity, intolerable delays and embarrassments would intervene, leading to multitudes of controversies, and the frequent dishonor of obligations that the necessities of the public require to be met promptly at maturity. Much of the real business value of this paper would be thus

destroyed. It is not only convenient, but necessary to the utility of negotiable paper, that the law should protect the party paying at maturity, where the person receiving payment appears from the posssession of the paper to be entitled to it. But where the paper has been long due, the necessities of the rule cease. For its utility as currency in business affairs is at an end. It is essential to that use of it, that the holder for value, in good faith, should be protected, notwithstanding the person transferring the paper to him was without title.

The same rule applies which protects the payment to one without title, when made at maturity. The production of the paper by the holder, without anything indicating his want of title, is sufficient to confer a complete title upon the purchaser. Where the paper, however, has become due, the attribute is lost which will enable the seller to confer a better title than his own upon the buyer. And the law affecting the rights of parties to other personal property then becomes applicable. The only difference being that negotiable paper still retains its negotiability, so that the holder having title can negotiate that title to another. But the indorser is presumed to be acquainted with the circumstances affecting its validity in the hands of the person who was holder when it became due, and consequently must stand in his character. (*Williams* agt. *Matthews*, 3 *Cow. R.* 260; *Andrews* agt. *Pond*, 13 *Curtis' U. S. Decisions*, 49, 50; *Goodman* agt. *Simonds*, 20 *How. U. S. R.* 365, 366.) The rule as stated by *Parsons on Bills and Notes* (*vol.* 2, 279), is, " that where the defective title appears on the face of the lost or stolen instrument at the time of transfer, or where it is transferred after it is due or after dishonor. the party obviously has constructive notice of his assignor's infirmity, and can have no better title than he." This places him precisely where the law applicable to sales of other kinds of personal property would, if the article sold is not negotiable. Pos-

session alone, in that case, is not sufficient to protect the person who mistakenly acts upon the faith of it. Those who buy, and those who pay upon the assurance arising from that circumstance, do so at their peril. While possession is presumptive evidence of title, it is liable to be overthrown by any one maintaining a paramount right. The presumption is alike which applies to the possession of a stolen horse and to the possession of an over-due note. As to personal property generally, the rule is well settled that the actual owner cannot be concluded, or his title affected by the disposition made of it by a wrong-doer, or any one acquiring it through him (*Wooster* agt. *Sherwood*, 25 *N. Y. R.* 286, 287). It follows that the person who received the payment from the defendant did it without authority. He had no title to the note, because it was acquired under the felonious taker, and long after it became due. No action could have been maintained upon it by him against the defendant. That infirmity distinguishes this case from all those relied upon to sustain the defence. The paper in them was received before its maturity and for value, which was sufficient to entitle the holder to enforce collection by action, and of course would justify a voluntary payment. Unless the paper properly falls within that class, or is presented for payment when it matures, the maker is not protected in paying, if it appears that the holder was not actually authorized to receive it. Production of the paper by the person demanding payment, will only be sufficient where it is done in the usual course of business, which, in judgment of law, is at the time of its maturity. Where the payment is made long after the paper becomes due, the party relying upon it to make the defence successful, must satisfy the jury that it was made to one actually authorized to receive it. By the ruling at the circuit, that was excluded from the consideration of the jury.

The verdict should be set aside and a new trial granted.

MARVIN, J., also delivered an opinion mainly devoted to an analysis of the authorities cited by Judges GROVER and DANIELS, as follows :

Cases cited by GROVER, J., *Gill* agt. *Cubitt* (3 *Barn. & Cress.* 446). Brother GROVER speaks of this case as a case where payment was made under suspicious circumstances, &c., to one possessing the paper, &c., not being valid against the real owner who had lost it, and from whom it had been stolen. The stolen bill was not paid by the acceptor, but it was discounted by a broker, and he as indorser brought the action against the acceptor, who defended, and had a verdict. The question for the jury was whether the plaintiff took *the bill under circumstances which ought to have excited the suspicion of a prudent and careful man.* (It was this position which the subsequent cases overruled.) The question whether a payment by the acceptor at maturity or *afterwards*, without notice, was not in the case. In that case notice of the loss or theft was given, and the acceptor defended.

Brother DANIELS quotes from 2 *Parsons on Bills and Notes*, 212, 213, thus : " Payment to a wrong party of a note or bill long dishonored, or of a check long after it was drawn, does not discharge the payee." *Parsons* cites only *Scoby* agt. *Ramsbottom* (2 *Camp.* 485), and his chapter on checks. This case is stated in a note on page 80. " A check had been torn in pieces by the drawer and thrown aside ; these pieces were pasted together on another slip of paper, the rents, however, being quite visible, and the face of the check soiled and dirty. This check was presented by a stranger and paid without inquiry, and the bank was held liable to the drawer, the position of the instrument being sufficient notice of cancellation." The text in *Parsons*, *pages* 79, 80, is : " If a bank pays a check which was cancelled and the cancelling remains, or a check which had been torn to pieces and then pasted together, or one which is so long over due as to be stale, or other-

wise justifying suspicion and inquiry, he pays it at his own peril." He cites only *Scoby* agt. *Ramsbottom*. *Parsons on page* 212, speaks of paying a note to a thief or finder, not discharging the payer unless made in good faith, without knowledge or direct means of knowledge, and *in the usual course of business*. He cites *Miller* agt. *Race* (1 *Burrows*, 452), where a *bona fide* holder of a stolen note was allowed to recover, though the banker had notice of the theft. He cites *Pearson* agt. *Hutchinson* (2 *Camp*. 211; 6 *Esp*. 126 ; *see these cases*).

Brother DANIELS cites *Chitty on Bills*, 394, to the same effect as *Parsons*, and *Chitty* cites the same cases and *Bevan* agt. *Hill* (2 *Camp*. 381). Let us see what these cases are. The case of *Pearson* agt. *Hutchinson* (3 *Camp*. *and* 6 *Espinasse*), was an action *at law* against the acceptor of a bill lost after it was indorsed, and it not appearing to have been destroyed; it was held that the action would not lie, though a bond of indemnity was tendered. *Brown* agt. *Hill* (2 *Camp*. 381). The buyer of stock had given his check, the vendor lost it, and the vendee refused to pay without an indemnity. The bankers failed four months after, with funds of the drawer of the check in their hands to answer it. It was held that the vendor of the stock could not maintain an action against the vendee for the price of the stock.

These cases do not show that the payment of a note by the maker after it is due, to one who presents it for payment, will be invalid in case the party to whom it was paid was not a *bona fide* holder. There must be some notice or circumstances beyond the mere fact that the note was past due. Indeed, the modern authorities as to the title of a holder of a bill or note, go to the extent of the charge, that nothing short of fraud will defeat his title. And these cases are cited by *Story* by way of analogy, in cases of payment and discharge of the note. It is true that this rule requiring fraud to defeat the title of the holder, applies

only to those cases where the note or bill was transferred before maturity, for if transferred after maturity, the holder always takes it subject to the equities between the parties to the note. The maker of the note must pay it to some one. The possession of the note is *prima facie* evidence of title, whether the note is due or not, and I concur in the opinion that the maker, in the absence of fraud on his part, may safely pay it to any one who presents it for payment. If the evidence is clear, as in the case of the cancelled check, that the presentor for payment had no title, the payment of it would be a fraud upon the true owner. It would be a payment in bad faith. This was a question for the jury, and it was fairly submitted. I think there was no error in the charge, and I concur with brother GROVER, that a new trial should be denied.

DAVIS, P. J., although he heard the argument took no part in the decision.

Motion for new trial denied.